UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| PERFETTI VAN MELLE USA, INC., AND PERFETTI VAN MELLE BENELUX B.V., | 4:15-CV-04093-RAL |
| Plaintiffs, | |
| | OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION |
| vs. | |
| MIDWEST PROCESSING, LLC, AND DEXTER JORGENSEN, | |
| Defendants. | |

Plaintiffs Perfetti Van Melle USA, Inc. and Perfetti Van Melle Benelux B.V. (collectively, "Perfetti") arranged through a third party for Defendants Midwest Processing, LLC ("Midwest") and Dexter Jorgensen ("Jorgensen") to recycle candy that Perfetti had manufactured but deemed unsalable. Perfetti moved for a temporary restraining order, preliminary injunction, and a permanent injunction against Defendants after learning that Defendants had diverted the candy to retail stores for sale rather than recycling it. For the reasons explained below, this Court grants Perfetti's motion for a preliminary injunction.

**I.     Facts**

This Court draws the facts from the Verified Complaint, the affidavits and sworn declarations filed by Perfetti, and the testimony and exhibits from the hearing on May 28, 2015. See Doe v. S. Iron R-1 Sch. Dist., 498 F.3d 878, 880 (8th Cir. 2007) (affirming a preliminary injunction based on a verified complaint and additional documents); Movie Sys., Inc. v. MAD

1

Minneapolis Audio Distribs., 717 F.2d 427, 431–32 (8th Cir. 1983) (holding that courts may rely solely on affidavits in granting preliminary injunctions).

Perfetti is a global manufacturer of candy and chewing gum whose brands include Airheads®, Airheads Xtremes®, and Mentos®. Doc. 1 at ¶¶ 1, 12. Perfetti introduced a new product in 2014 called "Airheads Xtremes® Bites" ("Xtremes® Bites"). Doc. 1 at ¶ 20; Doc. 18-1 at 1; Doc. 18-2 at 1. Xtremes® Bites were initially imported from Italy, but Perfetti USA began manufacturing the candy in the United States in July 2014. Doc. 1 at ¶ 23; Doc. 18-1 at 1; Doc. 18-2 at 1.

Between November 2014 and February 2015, Perfetti USA determined that certain Xtremes® Bites production runs did not meet specifications and would therefore be withheld as unsalable product. Doc. 1 at ¶ 25; Doc. 18-2 at 1–2. The sanding sugar on some of the product did not adhere correctly, causing the product to become harder than usual, and individual pieces showed signs of clumping together in the package. Doc. 1 at ¶ 25; Doc. 18-2 at 1–2. Other problems arose with packaging of the product, including sealing defects. Doc. 1 at ¶ 25; Doc. 18-2 at 1–2. Although posing no health or safety risk to consumers, the withheld product had defects in quality and/or packaging that are common when calibrating a new production line and that would make the product less appealing to consumers. Doc. 1 at ¶ 26; Doc. 18-2 at 2.

Perfetti USA contacted an environmental services broker, Advanced Environmental, Inc. ("Advanced Environmental"), to arrange for the recycling of the unsalable Xtremes® Bites. Doc. 1 at ¶ 28; Doc. 18-2 at 2. Perfetti USA specifically instructed Advanced Environmental that the candy was not to be sold out on the market. On Perfetti USA's behalf, Advanced Environmental engaged Midwest, a South Dakota company operated by Jorgensen, to haul away and recycle the unsalable Xtremes® Bites. Doc. 1 at ¶¶ 7, 8, 28; Doc. 18-2 at 2. Perfetti USA

2

understood that Midwest had the capacity to separate the candy from its packaging, and then convert the candy into agricultural uses while recycling the plastic and cardboard. Doc. 1 at ¶ 28. Midwest and Jorgensen agreed with Advanced Environmental to recycle the unsalable Xtremes® Bites. Doc. 18-3 at 2. Advanced Environmental never told Jorgensen or Midwest that they could sell the candy. Doc. 18-3 at 3.

Midwest hired Golden View Logistics, Inc. ("Golden View") to transport the unsalable Xtremes® Bites from Perfetti USA's facility in Kentucky. Doc. 18-2 at 2; Doc. 18-3 at 2. Between November 2014 and February 2015, Golden View picked up fifteen truckloads of unsalable Xtremes® Bites and candy slurry. Doc. 1 at ¶ 29; Doc. 18-2 at 3. It appears that only four of the truckloads ended up at Midwest's facility in South Dakota and that Midwest had Golden View transport the remaining eleven loads to various wholesalers in Belmont, Mississippi. Doc. 1 at ¶¶ 30, 31; Doc. 18-4 at 2, 7. Midwest provided[1] certificates of disposal attesting to the recycling of the individual loads. Doc. 1 at ¶ 33; Doc. 18-2 at 2, 6; Doc. 18-3 at 2–3, 16–29. The certificates of disposal came attached to bills of lading showing that the ultimate destination of the loads was Midwest's business address in Burbank, South Dakota. Doc. 1 at ¶ 31; Doc. 18-2 at 6–7; Doc. 18-3 at 16–29.

In mid-April 2015, Perfetti USA first learned that an independent grocery sales broker, Tray Harrison, had approached JONS International Markets ("JONS"), a Southern California-based grocer, with sample 3.8 ounce bags of Xtremes® Bites. Doc. 1 at ¶ 34; Doc. 18-2 at 2. Harrison had offered to sell JONS multiple pallets of Xtremes® Bites for well below the average

---

[1]Perfetti's verified complaint and the declaration from their CFO both state that Midwest sent Perfetti USA falsified certificates of disposal. Doc. 1 at ¶ 33; Doc. 18-2 at 2. However, the declaration from Advanced Environmental employee Amber Edwards suggests that Midwest sent the falsified certificates to her and that she forwarded them on to Perfetti USA. Doc. 18-3 at 2–3. Either way, Midwest and Jorgensen sent misleading certificates of disposal that Perfetti received and relied upon.

wholesale price.  Doc. 1 at ¶ 36; Doc. 18-2 at 2.  Suspicious of the low price and the fact that Harrison was not affiliated with Crossmark, Perfetti's authorized sales broker, JONS contacted a Crossmark representative about the offer, who in turn contacted Perfetti USA.  Doc. 1 at ¶¶ 37, 38; Doc. 18-2 at 2.  Perfetti USA traced the lot code on a sample bag that Harrison left with JONS to a production run of Xtremes® Bites that Midwest received in February 2015 for recycling.  Doc. 1 at ¶ 39; Doc. 18-2 at 2–3.  During court proceedings in Texas, Harrison revealed that he had obtained the Xtremes® Bites from Silver Dollar Sales, Inc., one of the Mississippi wholesalers to whom Midwest had delivered truckloads of the unsalable candy. Doc. 1 at ¶ 31, 41.

Diverted Xtremes® Bites also have appeared in Alabama.  Doc. 1 at ¶ 46.  A grocery store in Hartford, Alabama offered to sell Crossmark representatives a bin of two-ounce Xtremes® Bites packages for $800.00.  Doc. 1 at ¶ 46.  The store was selling the two-ounce packages individually for well below the suggested retail price.  Doc. 1 at ¶ 46; Doc. 18-2 at 3. The bin was gone when a Crossmark employee returned to purchase it on April 22, 2015, but the employee was still able to obtain twenty-five leftover packages of two-ounce Xtremes® Bites. Doc. 1 at ¶ 47; Doc. 18-2 at 3.  The lot codes on the twenty-five packages matched with product that Perfetti USA had provided to Midwest for recycling in November 2014.  Doc. 1 at ¶ 48; Doc. 18-2 at 3.

Perfetti also has learned that a major national dollar store chain purchased 20,000 pounds of Xtremes® Bites in early 2015, and that as of May 2015, 60,000 individual units remained on store shelves nationwide.  Doc. 1 at ¶¶ 42–44; Doc. 18-2 at 3.  Given that Xtremes® Bites is a new product, it would be unusual for legitimate product to appear in closeout and dollar stores at this point in the sales cycle.  Doc. 18-2 at 3.  The national dollar store chain had another offer in

4

late April 2015 to purchase a large amount of Xtremes® Bites. Doc. 18-2 at 3. Although the deal fell through, Perfetti believes that the price and quantity suggests that it was diverted product being sold. Doc. 18-2 at 3; Doc. 18 at 7. Perfetti USA also has recovered diverted Xtremes® Bites for sale on eBay. Doc. 1 at ¶ 45; Doc. 18-2 at 3.

Perfetti filed a verified complaint against Midwest and Jorgensen on Friday, May 22, 2015. Doc. 1. Perfetti moved for a temporary restraining order, a preliminary injunction, and a permanent injunction that same day. Doc. 8. Perfetti in its motion sought to enjoin the Defendants from any distribution or sale of Xtremes® Bites in their possession, from the use of the Airheads® and Airheads Xtremes® marks in commerce, and from representing or creating the impression that the Defendants are authorized resellers or distributors of Xtremes® Bites products. Doc. 8. Perfetti also sought an order that Defendants provide an accounting of the revenues and profits they received from their use of the Airheads® trademark and their unauthorized sales of Xtremes® Bites products, that Defendants return to Perfetti all materials in their possession bearing the Airheads® trademarks, and that Defendants preserve all documents and other tangible things related to Perfetti's lawsuit. Doc. 8.

This Court set a hearing on Perfetti's motion for a temporary restraining order, notifying the Defendants by email that the hearing would take place at 4:00 p.m. on May 22, 2015, and inviting Defendants to participate in person or by telephone. Doc. 16. Jorgensen emailed this Court prior to the hearing "Please do not use this email address. It is a personal account." Doc. 16. This Court responded by advising Jorgensen that he was a named defendant in the case. Doc. 16. Perfetti alone participated in the hearing. Doc. 14. This Court granted Perfetti's motion for a temporary restraining order and entered an order requiring that Defendants stop selling or distributing Xtremes® Bites, stop using the Airheads® and Airheads Xtremes® marks

5

in commerce, and preserve all documents and other tangible items relevant to Perfetti's lawsuit. Doc. 14.

On the morning of May 26, 2015, Jorgensen sent this Court an email containing a name and phone number but no other text. Doc. 17. This Court responded later that morning, explaining that it was unsure why Jorgensen had sent the email with the name and phone number, that it had granted Perfetti's request for a temporary restraining order, that there was a hearing set for Thursday, May 28, at 1:00 p.m. on the request for a preliminary injunction, and that this Court was discontinuing further email contact with Jorgensen and any of the parties or their attorneys. Doc. 17. Jorgensen acknowledged receiving the Court's email notifying him of the preliminary injunction hearing. Doc. 17.

On May 26, 2015, Perfetti served Jorgensen and Midwest with the order granting Perfetti's motion for a temporary restraining order. Docs. 19, 20, 21. The order stated that a hearing on Perfetti's motion for a preliminary injunction was set for May 28, 2015. Doc. 14. The May 28 hearing was held as planned but only Perfetti attended. After hearing testimony from three Perfetti witnesses, this Court orally granted the motion for a preliminary injunction, with a written order to follow. This is that order.

## II. Analysis

In determining whether to grant a preliminary injunction, this Court considers the factors set forth in Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109 (8th Cir. 1981) (en banc): "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Id. at 113; see also Germalic v. Gant, No. CIV 12-3030-RAL, 2012 WL 5334737, at *2–3 (D.S.D. Oct. 26,

2012) (applying Dataphase factors when considering request for preliminary injunction); Crow Creek Sioux Tribal Farms, Inc. v. U.S. I.R.S., 684 F. Supp. 2d 1152, 1157–61 (D.S.D. 2010) (same).

Under the Dataphase factors, Perfetti is entitled to preliminary injunctive relief. The first Dataphase factor concerns the threat of irreparable harm to Perfetti. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009). A company's loss of goodwill and reputation among its customers is often not quantifiable, and can therefore amount to irreparable harm. Rogers Grp., Inc. v. City of Fayetteville, Ark., 629 F.3d 784, 789–90 (8th Cir. 2010) ("We have previously held that a district court did not err when finding that a loss of goodwill among customers was sufficient to establish a threat of irreparable harm."); Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 805 (8th Cir. 2003) ("Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars."); United Healthcare Ins. Co. v. AdvancePCS, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."). Here, Xtremes® Bites is still in the new product rollout phase and many customers are trying Xtremes® Bites for the first time. Doc. 18-2 at 4. Customers' initial encounter with a product will often dictate whether they continue to purchase it. The unsalable Xtremes® Bites that Defendants diverted to the market fall below Perfetti's quality and packaging standards. Doc. 1 at ¶ 25; Doc. 18-2 at 1–2, 4. If customers purchase these unsalable Xtremes® Bites, they may dislike the product and not buy it in the future, unaware that the product is not representative of the Xtremes® Bites manufactured by Perfetti. The harm that this will cause Perfetti is not readily quantifiable, if at all. Accordingly, Perfetti will suffer

7

irreparable harm if Defendants are allowed to continue to pass off the unsalable Xtremes® Bites as representative of the Perfetti brand. The first Dataphase factor thus militates in favor of granting the preliminary injunction.

The next Dataphase factor is the balance between the harm to Perfetti and the injury that granting the injunction will inflict on Defendants. As the record stands now, it is difficult to discern any significant harm that Defendants would suffer from entry of a preliminary injunction. Perfetti transferred the unsalable Xtremes® Bites with the understanding that Defendants would recycle the candy for agricultural use, and Midwest represented through certificates of disposal and bills of lading that loads had gone to Burbank, South Dakota, for that purpose. Defendants have no right to divert loads to Mississippi and sell the candy for human consumption or to act as if they are a distributor of Perfetti products. At most, granting the preliminary injunction will deprive Defendants of further profit that they are not entitled to make and subject them to some inconvenience in providing discovery and an accounting and being available for a deposition as part of expedited discovery. Such harm to Defendants is minor in comparison to the harm Perfetti will suffer if ongoing distribution of unsalable Perfetti product occurs without Perfetti's consent or control. Accordingly, the second Dataphase factor weighs in Perfetti's favor.

The third Dataphase factor focuses on the probability that the movant will succeed on the merits. Probability of success on the merits in this context means that the moving party must show that it has "a 'fair chance of prevailing'" on the merits. Kroupa v. Nielsen, 731 F.3d 813, 818 (8th Cir. 2013) (quoting Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)). A "fair chance of prevailing" does not necessarily mean a greater than fifty percent likelihood of prevailing on the merits of the claim. Planned Parenthood, 530 F.3d at 731–32. Although Perfetti contends that it will succeed on all of the claims in the

verified complaint, it focuses on the fraud and deceit claims for purposes of the motion for a preliminary injunction.

To prove fraud under South Dakota law, Perfetti must show that Defendants 1) made a statement of fact; 2) that Defendants knew that this statement was untrue or they recklessly made it; 3) that Defendants made the statement with the intent to deceive and for the purpose of inducing Perfetti to act upon it; and 4) that Perfetti relied upon the statement and was induced thereby to act to their injury or damage.  N. Am. Truck & Trailer, Inc. v. M.C.I. Commc'n Servs., Inc., 751 N.W.2d 710, 713–14 (S.D. 2008).  Based on material of record in this case, Perfetti has at least a fair chance to prevail on its fraud claim.  Perfetti released the unsalable product at issue strictly for recycling and not for distribution and human consumption.  Midwest sent certificates of disposal stating that the individual truckloads had arrived at Midwest and had been recycled.  Doc. 1 at ¶ 33; Doc. 18-2 at 2, 6; Doc. 18-3 at 16–29.  Perfetti USA has since learned that the statements in some of the certificates of disposal were untrue, as Midwest had eleven truckloads of Xtremes® Bites shipped to Mississippi, and some of that product has appeared on the market.  Doc. 1 at ¶¶ 30, 31, 39, 48; Doc. 18-2 at 2–3; Doc. 18-4 at 2, 7.  Perfetti asserts that it continued to supply the unsalable Xtremes® Bites to Midwest based on Midwest's representation that the product was being recycled.  Doc. 18 at 11.  Had it known otherwise, Perfetti contends, it would have immediately ceased providing the unsalable Xtremes® Bites to Midwest.  Because the record establishes that Perfetti has a fair chance of prevailing on the merits of its fraud claim, the third Dataphase factor favors granting the motion for a preliminary injunction.

The fourth Dataphase factor—the public interest—also favors granting the preliminary injunction.  The public has an interest in buying products that meet a company's quality

standards rather than unwittingly buying products that have been earmarked for disposal or recycling. See 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.4 (3d ed. 2013). The public interest disfavors those who act fraudulently and favors honesty in commercial transactions.

The only remaining issue is bond. Rule 65 of the Federal Rules of Civil Procedure provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The amount of the bond rests within the sound discretion of the trial court . . . ." Stockslager v. Carroll Elec. Coop. Corp., 528 F.2d 949, 951 (8th Cir. 1976). One court has concluded that under the mandatory language of Rule 65(c), "requiring a bond in some amount before issuing a preliminary injunction is far the better course." Sak v. City of Aurelia, Iowa, 832 F. Supp. 2d 1026, 1048 (N.D. Iowa 2011) (citation and internal quotation marks omitted) (requiring a bond of $1.00 where the potential for damage was "extremely limited"). There is little practical difference between a one dollar bond and no bond. Given that Defendants appear to have no right to sell or distribute the unsalable Xtremes® Bites, there is little risk that enjoining Defendants from doing so will cause them legitimate monetary damage. Likewise, the accounting and expedited discovery responsibilities are costs of litigation commonly borne by litigating parties and do not justify a bond. Thus, Perfetti need not submit security in this case, although this Court will consider a motion and argument to the contrary if and when Defendants hire counsel or wish to argue for such a bond.

### III. Conclusion

For the reasons stated above, it is hereby

10

ORDERED that Plaintiffs' Motion for Expedited Discovery, Doc. 10, is granted only to the extent described below. It is further

ORDERED that Plaintiffs' Motion for Preliminary Injunction, Doc. 8, is granted and that Defendants and their officers, agents, servants, employees, suppliers, and all persons and entities in active concert and participation with them who receive notice of this Order, are enjoined as follows until further order of this Court:

1.      Defendants are enjoined from the distribution and sale of any Airheads Xtremes® Bites candy in their possession, custody, or control.

2.      Defendants are enjoined from the use of the Airheads® and Airheads Xtremes® marks in commerce, and from representing or creating the impression that they are authorized distributors or resellers of the Xtremes® Bites products.

3.      Defendants are ordered to notify forthwith all of their officers, agents, employees, and all persons and entities in active concert and participation with them of this Preliminary Injunction Order.

4.      Defendants and all persons in active concert or participation with them are ordered to preserve all Airhead Xtremes® Bites candy and all documents and other tangible things in their possession, whether written, electronic, or in any other format, that are or could be relevant to this lawsuit.

5.      Defendants are ordered to produce to Perfetti within ten (10) calendar days of the Court's entry of this Order an accounting of 1) the full address, telephone number, email address, and business or person who received, directly or indirectly from Defendants, any of the Xtremes® Bites or other of Plaintiffs' product; 2) all information in the possession or control of Defendants as to where the Xtremes® Bites or other of Plaintiffs' product received by

11

Defendants went and are now; and 3) the revenues and profits received by each Defendant relating to its or his sales of the Xtremes® Bites or other of Plaintiffs' products.

6.     Defendants shall preserve and produce with the accounting a copy of all emails, documents and records within their possession or control concerning the transportation of the product at issue, the location of all product at issue, the disposition of that product, and payments received by Defendants therefrom.

7.     Defendant Jorgensen, and if Plaintiffs serve a Rule 30(b)(6) designation, a designee for Midwest must make themselves available for depositions in South Dakota within ten (10) calendar days after providing the Court-ordered accounting and discovery required in paragraphs five and six above.   Plaintiffs may serve on Defendants a subpoena for further records to be produced at any such deposition.

8.     Defendants must cooperate with Plaintiffs on arrangements to retrieve, return and/or dispose of any of the Plaintiffs' product put on the market by or through Defendants.   If any issues arise on costs associated with that process, any party may bring the matter to the Court for a ruling.

It is finally

ORDERED that the Clerk of Court send to each of the Defendants a copy of this Opinion and Order Granting Preliminary Injunction by email and regular mail.

DATED this 4th day of June, 2015.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

12