UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



| | |
|---|---|
| PERFETTI VAN MELLE USA, INC., AND PERFETTI VAN MELLE BENELUX B.V., | 4:15-CV-04093-RAL |
| Plaintiffs, | |
| vs. | OPINION AND ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT OF COURT |
| MIDWEST PROCESSING, LLC, AND DEXTER JORGENSEN, | |
| Defendants. | |

Plaintiffs Perfetti Van Melle USA, Inc. and Perfetti Van Melle Benelux B.V. (collectively, "Perfetti") arranged through a third party for Defendants Midwest Processing, LLC ("Midwest") and Dexter Jorgensen ("Jorgensen") to recycle candy that Perfetti had manufactured but deemed unsalable. Perfetti moved for a temporary restraining order, preliminary injunction, and a permanent injunction against Defendants after learning that Defendants had diverted the candy to wholesalers and retail stores for sale rather than recycling it. This Court entered a temporary restraining order and, after an evidentiary hearing, granted Perfetti's motion for a preliminary injunction. Perfetti now has filed a Motion for Order to Show Cause, Doc. 25, because Defendants have not complied with discovery responsibilities mandated in the preliminary injunction order.

I.      **Facts**

1

These facts are repeated from the Opinion and Order Granting Preliminary Injunction, Doc. 24. This Court draws the facts from the Verified Complaint, the affidavits and sworn declarations filed by Perfetti, and the testimony and exhibits from the hearing on May 28, 2015. See Doe v. S. Iron R-1 Sch. Dist., 498 F.3d 878, 880 (8th Cir. 2007) (affirming a preliminary injunction based on a verified complaint and additional documents); Movie Sys., Inc. v. MAD Minneapolis Audio Distribs., 717 F.2d 427, 431–32 (8th Cir. 1983) (holding that courts may rely solely on affidavits in granting preliminary injunctions).

Perfetti is a global manufacturer of candy and chewing gum whose brands include Airheads®, Airheads Xtremes®, and Mentos®. Doc. 1 at ¶¶ 1, 12. Perfetti introduced a new product in 2014 called "Airheads Xtremes® Bites" ("Xtremes® Bites"). Doc. 1 at ¶ 20; Doc. 18-1 at 1; Doc. 18-2 at 1. Xtremes® Bites were initially imported from Italy, but Perfetti USA began manufacturing the candy in the United States in July 2014. Doc. 1 at ¶ 23; Doc. 18-1 at 1; Doc. 18-2 at 1.

Between November 2014 and February 2015, Perfetti USA determined that certain Xtremes® Bites production runs did not meet specifications and would therefore be withheld as unsalable product. Doc. 1 at ¶ 25; Doc. 18-2 at 1–2. The sanding sugar on some of the product did not adhere correctly, causing the product to become harder than usual, and individual pieces showed signs of clumping together in the package. Doc. 1 at ¶ 25; Doc. 18-2 at 1–2. Other problems arose with packaging of the product, including sealing defects. Doc. 1 at ¶ 25; Doc. 18-2 at 1–2. Although posing no health or safety risk to consumers, the withheld product had defects in quality and/or packaging that are common when calibrating a new production line and that would make the product less appealing to consumers. Doc. 1 at ¶ 26; Doc. 18-2 at 2.

2

Perfetti USA contacted an environmental services broker, Advanced Environmental, Inc. ("Advanced Environmental"), to arrange for the recycling of the unsalable Xtremes® Bites. Doc. 1 at ¶ 28; Doc. 18-2 at 2. Perfetti USA specifically instructed Advanced Environmental that the candy was not to be sold out on the market. On Perfetti USA's behalf, Advanced Environmental engaged Midwest, a South Dakota company operated by Jorgensen, to haul away and recycle the unsalable Xtremes® Bites. Doc. 1 at ¶¶ 7, 8, 28; Doc. 18-2 at 2. Perfetti USA understood that Midwest had the capacity to separate the candy from its packaging, and then convert the candy into agricultural uses while recycling the plastic and cardboard. Doc. 1 at ¶ 28. Midwest and Jorgensen agreed with Advanced Environmental to recycle the unsalable Xtremes® Bites. Doc. 18-3 at 2. Advanced Environmental never told Jorgensen or Midwest that they could sell the candy. Doc. 18-3 at 3.

Midwest hired Golden View Logistics, Inc. ("Golden View") to transport the unsalable Xtremes® Bites from Perfetti USA's facility in Kentucky. Doc. 18-2 at 2; Doc. 18-3 at 2. Between November 2014 and February 2015, Golden View picked up fifteen truckloads of unsalable Xtremes® Bites and candy slurry. Doc. 1 at ¶ 29; Doc. 18-2 at 3. It appears that only four of the truckloads ended up at Midwest's facility in South Dakota and that Midwest had Golden View transport the remaining eleven loads to various wholesalers in Belmont, Mississippi. Doc. 1 at ¶¶ 30, 31; Doc. 18-4 at 2, 7. Midwest provided[1] certificates of disposal attesting to the recycling of the individual loads. Doc. 1 at ¶ 33; Doc. 18-2 at 2, 6; Doc. 18-3 at 2–3, 16–29. The certificates of disposal came attached to bills of lading showing that the

___

[1] Perfetti's verified complaint and the declaration from their CFO both state that Midwest sent Perfetti USA falsified certificates of disposal. Doc. 1 at ¶ 33; Doc. 18-2 at 2. However, the declaration from Advanced Environmental employee Amber Edwards suggests that Midwest sent the falsified certificates to her and that she forwarded them on to Perfetti USA. Doc. 18-3 at 2–3. Either way, Midwest and Jorgensen sent misleading certificates of disposal that Perfetti received and relied upon.

ultimate destination of the loads was Midwest's business address in Burbank, South Dakota. Doc. 1 at ¶ 31; Doc. 18-2 at 6–7; Doc. 18-3 at 16–29.

In mid-April 2015, Perfetti USA first learned that an independent grocery sales broker, Tray Harrison, had approached JONS International Markets ("JONS"), a Southern California-based grocer, with sample 3.8 ounce bags of Xtremes® Bites. Doc. 1 at ¶ 34; Doc. 18-2 at 2. Harrison had offered to sell JONS multiple pallets of Xtremes® Bites for well below the average wholesale price. Doc. 1 at ¶ 36; Doc. 18-2 at 2. Suspicious of the low price and the fact that Harrison was not affiliated with Crossmark, Perfetti's authorized sales broker, JONS contacted a Crossmark representative about the offer, who in turn contacted Perfetti USA. Doc. 1 at ¶¶ 37, 38; Doc. 18-2 at 2. Perfetti USA traced the lot code on a sample bag that Harrison left with JONS to a production run of Xtremes® Bites that Midwest received in February 2015 for recycling. Doc. 1 at ¶ 39; Doc. 18-2 at 2–3. During court proceedings in Texas, Harrison revealed that he had obtained the Xtremes® Bites from Silver Dollar Sales, Inc., one of the Mississippi wholesalers to whom Midwest had delivered truckloads of the unsalable candy. Doc. 1 at ¶ 31, 41.

Diverted Xtremes® Bites also have appeared in Alabama. Doc. 1 at ¶ 46. A grocery store in Hartford, Alabama offered to sell Crossmark representatives a bin of two-ounce Xtremes® Bites packages for $800.00. Doc. 1 at ¶ 46. The store was selling the two-ounce packages individually for well below the suggested retail price. Doc. 1 at ¶ 46; Doc. 18-2 at 3. The bin was gone when a Crossmark employee returned to purchase it on April 22, 2015, but the employee was still able to obtain twenty-five leftover packages of two-ounce Xtremes® Bites. Doc. 1 at ¶ 47; Doc. 18-2 at 3. The lot codes on the twenty-five packages matched with product

4

that Perfetti USA had provided to Midwest for recycling in November 2014. Doc. 1 at ¶ 48;
Doc. 18-2 at 3.

Perfetti also has learned that a major national dollar store chain purchased 20,000 pounds
of Xtremes® Bites in early 2015, and that as of May 2015, 60,000 individual units remained on
store shelves nationwide. Doc. 1 at ¶¶ 42–44; Doc. 18-2 at 3. Given that Xtremes® Bites is a
new product, it would be unusual for legitimate product to appear in closeout and dollar stores at
this point in the sales cycle. Doc. 18-2 at 3. The national dollar store chain had another offer in
late April 2015 to purchase a large amount of Xtremes® Bites. Doc. 18-2 at 3. Although the
deal fell through, Perfetti believes that the price and quantity suggests that it was diverted
product being sold. Doc. 18-2 at 3; Doc. 18 at 7. Perfetti USA also has recovered diverted
Xtremes® Bites for sale on eBay. Doc. 1 at ¶ 45; Doc. 18-2 at 3.

Perfetti filed a verified complaint against Midwest and Jorgensen on Friday, May 22,
2015. Doc. 1. Perfetti moved for a temporary restraining order, a preliminary injunction, and a
permanent injunction that same day. Doc. 8. Perfetti in its motion sought to enjoin the
Defendants from any distribution or sale of Xtremes® Bites in their possession, from the use of
the Airheads® and Airheads Xtremes® marks in commerce, and from representing or creating
the impression that the Defendants are authorized resellers or distributors of Xtremes® Bites
products. Doc. 8. Perfetti also sought an order that Defendants provide an accounting of the
revenues and profits they received from their use of the Airheads® trademark and their
unauthorized sales of Xtremes® Bites products, that Defendants return to Perfetti all materials in
their possession bearing the Airheads® trademarks, and that Defendants preserve all documents
and other tangible things related to Perfetti's lawsuit. Doc. 8.

This Court set a hearing on Perfetti's motion for a temporary restraining order, notifying the Defendants by email that the hearing would take place at 4:00 p.m. on May 22, 2015, and inviting Defendants to participate in person or by telephone. Doc. 16. Jorgensen emailed this Court prior to the hearing "Please do not use this email address. It is a personal account." Doc. 16. This Court responded by advising Jorgensen that he was a named defendant in the case. Doc. 16. Perfetti alone participated in the May 22 hearing. Doc. 14. This Court granted Perfetti's motion for a temporary restraining order and entered an order requiring that Defendants stop selling or distributing Xtremes® Bites, stop using the Airheads® and Airheads Xtremes® marks in commerce, and preserve all documents and other tangible items relevant to Perfetti's lawsuit. Doc. 14.

On the morning of May 26, 2015, Jorgensen sent this Court an email containing a name and phone number but no other text. Doc. 17. This Court responded later that morning, explaining that it was unsure why Jorgensen had sent the email with the name and phone number, that it had granted Perfetti's request for a temporary restraining order, that there was a hearing set for Thursday, May 28, at 1:00 p.m. on the request for a preliminary injunction, and that this Court was discontinuing further email contact with Jorgensen and any of the parties or their attorneys. Doc. 17. Jorgensen acknowledged receiving the Court's email notifying him of the preliminary injunction hearing. Doc. 17.

On May 26, 2015, Perfetti served Jorgensen and Midwest with the order granting Perfetti's motion for a temporary restraining order. Docs. 19, 20, 21. The order stated that a hearing on Perfetti's motion for a preliminary injunction was set for May 28, 2015. Doc. 14. The May 28 hearing was held as planned but only Perfetti attended. After hearing testimony

from three Perfetti witnesses, this Court orally granted the motion for a preliminary injunction,

with a written order to follow.

In an Opinion and Order Granting Preliminary Injunction, Doc. 24, this Court required

Defendants to:

> 1.     Stop their distribution and sale of any Airheads Xtremes® Bites candy in their possession, custody, or control.
> 2.     Stop their use of the Airheads® and Airheads Xtremes® marks in commerce, and from representing or creating the impression that they are authorized distributors or resellers of the Xtremes® Bites products.
> 3.     Notify forthwith all of their officers, agents, employees, and all persons and entities in active concert and participation with them of this Preliminary Injunction Order.
> 4.     Preserve all Airhead Xtremes® Bites candy and all documents and other tangible things in their possession, whether written, electronic, or in any other format, that are or could be relevant to this lawsuit.
> 5.     Produce to Perfetti within ten (10) calendar days of the Court's entry of this Order an accounting of 1) the full address, telephone number, email address, and business or person who received, directly or indirectly from Defendants, any of the Xtremes® Bites or other of Plaintiffs' product; 2) all information in the possession or control of Defendants as to where the Xtremes® Bites or other of Plaintiffs' product received by Defendants went and are now; and 3) the revenues and profits received by each Defendant relating to its or his sales of the Xtremes® Bites or other of Plaintiffs' products.
> 6.     Preserve and produce with the accounting a copy of all emails, documents and records within their possession or control concerning the transportation of the product at issue, the location of all product at issue, the disposition of that product, and payments received by Defendants therefrom.
> 7.     Make Defendant Jorgensen, and if Plaintiffs serve a Rule 30(b)(6) designation, a designee for Midwest available for depositions in South Dakota within ten (10) calendar days after providing the Court-ordered accounting and discovery required in paragraphs five and six above.
> 8.     Cooperate with Plaintiffs on arrangements to retrieve, return and/or dispose of any of the Plaintiffs' product put on the market by or through Defendants.  If any issues arise on costs associated with that process, any party may bring the matter to the Court for a ruling.

Doc. 24 at 11–12.

On June 22, 2015, Perfetti filed a Motion for Order to Show Cause, Doc. 25, because

Defendants had not complied within ten days with the discovery requirement set forth in

Paragraph 5 above. Doc. 25. It is a mystery whether Defendants have complied with any of the requirements ordered by this Court.

On June 24, 2015, Perfetti filed an Application for Entry of Default. Doc. 28. Because Defendants have not answered or otherwise responded to the complaint, the Clerk of Court entered default on liability issues against Defendants on June 25, 2015. Doc. 30. Issues remain as to Defendants apparent lack of compliance with this Court's order and the damages and remedies to which Perfetti might be entitled.

## II.    Discussion

Rule 37 of the Federal Rules of Civil Procedure addresses situations where there is a failure by a party to make disclosure or to cooperate in discovery and what sanctions may be imposed on such a party. To impose sanctions under Rule 37, "there must be an order compelling discovery, a willful violation of that order, and prejudice to the other party." Chrysler Corp. v. Carey, 186 F.3d 1016, 1019 (8th Cir. 1999).

Here, the Opinion and Order Granting Preliminary Injunction, Doc. 24, compelled Defendants to make a limited discovery disclosure within ten calendar days of June 4, 2015, as well as undertake other action. Defendants have received notice of the pleadings and Court orders in this case. Indeed, this Court has been diligent in ensuring that Defendants receive notice and have an opportunity to participate in the hearings. Defendants' failure to comply with Paragraph 5 contained within the June 4, 2015, Opinion and Order is willful. There exists prejudice to Perfetti as a result for the reasons explained in this Court's prior opinion. See Doc. 24 at 7–10. In short, unsalable product bearing Perfetti's trademark is out on the market, and Perfetti needs and wants to get it off the market before further damage to Perfetti's goodwill and reputation occur. Defendants apparently caused the unsalable product to be on the market,

8

despite the fact that Defendants were authorized only to recycle and dispose of it. Defendants have information about what happened to certain loads of the Perfetti product that Defendants received and where the unsalable product might be now.

Rule 37(b)(2) requires "that the sanction be 'just' and relate to the claim at issue in the order to provide discovery." Hairston v. Alert Safety Light Products, Inc., 307 F.3d 717, 719 (8th Cir. 2002) (citation omitted). Rule 37(b)(2) provides the following examples of sanctions that the court can impose:

> i.      directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> ii.     prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> iii.    striking pleadings in whole or in part;
>
> iv.     staying further proceedings until the order is obeyed;
>
> v.      dismissing the action or proceeding in whole or in part;
>
> vi.     rendering a default judgment against the disobedient party; or
>
> vii.    treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A). Additionally, the court can require the disobedient party to pay the reasonable expenses, including attorneys' fees, caused by the failure. Fed. R. Civ. P. 37(b)(2)(C); Superior Composite Structures, LLC v. Parrish, 10-cv-4066-KES, Doc. 153 at 8–9 (D.S.D. June 13, 2013).

In this case, the Clerk of Court already has entered default against Defendants for their failure to answer or otherwise respond to the complaint. Many of the remedies available under Rule 37(b)(2) do not fit with the status of this case. For instance, Defendants have no pleadings

9

to strike, Defendants have raised no defenses, and a stay or dismissal of the case benefits the Defendants. Rule 37(b)(2)(vii) allows this Court to treat "as contempt of court the failure to obey any order." "Rule 37(b)(2) gives the court a broad discretion to make whatever disposition is just in the light of the facts of the particular case." 8B Charles Alan Wright et al., Federal Practice and Procedure § 2289 (3d ed. 1998). Indeed, an appellate court has upheld civil contempt sanctions as high as $500,000, plus a supplemental damage award of $507,779, as a sanction for a conscious and willful decision to withhold information a court ordered to be disclosed. SynQor, Inc. v. Artesyn Techs., Inc., 709 F.3d 1365, 1386 (Fed. Cir. 2013).

Now this Court is not contemplating a million dollar sanction against these Defendants, but has given thought to whether to send the United States Marshal out to seize the records and take Defendant Jorgenson into temporary custody to be held in until he is deposed. "[C]ourts have inherent powers to enforce compliance with their lawful orders through civil contempt." Shillitani v. United States, 384 U.S. 364, 370 (1966). As part of this contempt power, courts may employ incarceration to coerce a defendant into complying with an order. Chicago Truck Drivers v. Bhd Labor Leasing, 207 F.3d 500, 505 (8th Cir. 2000). This Court's interest, of course, is in proper administration of justice, which requires parties to abide by orders of this Court, and not in heavy-handed sanctions. Ideally Defendants will promptly cure their dereliction and disregard for the Court order. However, something must be done to ensure that orders of this Court are not being flouted and ignored. This Court wants to hear from the Defendants personally and see whether they promptly cure their apparent contempt of the court order before determining what, if any, sanctions to impose. 207 f.3d 500

## III.    Order and Conclusion

For the reasons contained herein, it is hereby

ORDERED that Plaintiffs' Motion for Order to Show Cause, Doc. 25, is granted.  It is further

ORDERED that Defendant Midwest Processing, LLC and Defendant Dexter Jorgenson personally appear before this Court at the United States Courthouse in Sioux Falls, South Dakota, on July 10, 2015, at 10:00 a.m., to show cause why they should not be held in contempt of court and to address what, if any, sanction should be imposed on Defendants.  It is further

ORDERED that Defendants immediately comply with all provisions of the Opinion and Order Granting Preliminary Injunction, Doc. 24, and further that Defendants' full and timely compliance or lack of compliance with that order will directly affect the sanctions to be imposed. It is further

ORDERED that Plaintiffs may seek reasonable attorneys' fees and costs as part of the sanctions under Rule 37(b)(2)(C), including but not limited to the costs in bringing the Motion for Order to Show Cause.  It is finally

ORDERED that the Clerk of Court email and mail a copy of this Opinion and Order to Defendants.

DATED this __2nd__ day of July, 2015.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

11